J-S06044-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: L.F., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: J.R., FATHER | No. 2709 EDA 2014 |

Appeal from the Order entered August 25, 2014,
in the Court of Common Pleas of Philadelphia County,
Family Court, at No(s): CP-51-AP-0000629-2013;
CP-51-DP-0001582-2011

| | |
|---|---|
| IN THE INTEREST OF: J.F., A/K/A J.R., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: J.R., FATHER | No. 2757 EDA 2014 |

Appeal from the Order entered August 25, 2014,
in the Court of Common Pleas of Philadelphia County,
Family Court, at No(s): CP-51-AP-0000628-2013;
CP-51-DP-0001583-2011

BEFORE: BENDER, P.J.E., LAZARUS, and FITZGERALD*, JJ.

MEMORANDUM BY FITZGERALD, J.:                    **FILED MAY 11, 2015**

Appellant, J.R. ("Father"), appeals from the orders entered in the Philadelphia County Court of Common Pleas involuntarily terminating his parental rights to L.F., born in January 2007, and J.F., born in June 2011 (collectively "the Children").[1] He avers the court erred in finding grounds for termination under 23 Pa.C.S. § 2511 (a)(1), (2), (5), (8), and (b). We

_____

* Former Justice specially assigned to the Superior Court.

[1] On the same day, the court terminated the parental rights of the mother, R.F. ("Mother"). According to Appellee Philadelphia Department of Human Services ("DHS"), Mother did not appeal. DHS' Brief at 11 n2.

affirm.

The trial court aptly summarized the factual and procedural history of this case as follows.

DHS initially became involved with this family on January 29, 2007, [upon] a General Protective Services report ("GPS") alleging that [Mother] tested positive for phencyclidine ("PCP") at the time of [L.F.'s] birth. [L.F.] remained hospitalized due to his exposure to drugs in utero. Mother admitted that she used cigarettes, alcohol, and cocaine on an almost daily basis during her pregnancy with [L.F.] The family subsequently stabilized and DHS closed its case.

The family became involved with DHS again on June 6, 2011, when DHS received a GPS report which alleged that Mother tested positive for PCP at the birth of [J.F. J.F.'s] subsequent toxicology screen at the hospital was positive for PCP. [J.F.] weighed four pounds and eight ounces at the time of his birth.

On July 18, 2011, DHS developed the Initial Family Service Plan ("FSP") and held a meeting. Father did not attend or otherwise participate in that meeting. At this time, there were no objectives for Father.

On August 9, 2011, DHS received a GPS report alleging that Mother was observed attempting to push [J.F., who was in a stroller,] into traffic. [J.F. was] not strapped in, and only wearing a one-piece infant undergarment. Mother was under the influence of PCP at the time of the incident. Following this incident, DHS obtained an Order of Protective Custody ("OPC") for both children and placed them in foster care.

At the time of the [C]hildren's placement, Father was minimally involved in their care. However, Father was made aware of Mother's PCP abuse. Father stated that he was unable to care for the [C]hildren because of his work schedule. On August 24, 2011, an adjudicatory hearing was held for both children. The [trial] court adjudicated the [C]hildren dependent and committed them to DHS

based on the present inability of the parents.

On September 20, 2011, DHS revised the FSP. [The] Children's goal was to return to parent/guardian/custodian. Father's objectives were to visit [the C]hildren at the office of the placement agency on a weekly basis, keep and maintain regular contact with [the C]hildren, meet regularly with the agency social worker, participate in the Healthy Relationships Couples program with Mother, and comply with the Individual Service Plan ("ISP"). Father attended the meeting and signed the revised FSP. On November 29, 2011, DHS referred Father to the Achieving Reunification Center ("ARC"). However, ARC deemed the referral inappropriate because Father did not speak English, and as a result could not participate in the services provided by ARC. Further research by ARC revealed that all service goals for Father could be achieved at Casa de Consejeria Y Salud Integral, Inc. ("CCSI") in Spanish. ARC referred Father to CCSI on November 29, 2011.

On December 1, 2011, the FSP was again revised. The goal for [the C]hildren was to return to parent/guardian/custodian and Father's objectives were to visit [the C]hildren at the office of the placement agency on a weekly basis, keep and maintain regular contact with [the C]hildren, to meet regularly with the agency social worker, to comply with the ISP, and attend services at CCSI. Father attended the meeting and signed the FSP. The FSP was revised again on May 15, 2012 and on November 27, 2012. All of Father's objectives remained the same. Father attended and signed the revised FSP. During the time the [C]hildren have been in care, Mother has resided on and off with Father.

In the ISP quarterly reports for the [C]hildren from El Concilio for the period of May 7, 2013 through August 7, 2013, it was noted that obstacles to reunification remained. It was also noted that there were concerns about Father's ability to care for the [C]hildren independently, set boundaries for Mother and the [C]hildren while Mother attempted to achieve and maintain sobriety, and ensure the [C]hildren's safety with and around Mother. Father has stated that he is unable to

create boundaries for Mother throughout the life of this case. Father is unwilling to put the [C]hildren's needs before Mother's. Father also attended parenting classes, but did not complete the program due to his work schedule. Father was given twice a week supervised visits. Father only was able to visit once a week. When Father attends his visits, Father is reluctant to work on activities, such as assisting [L.F.] with homework. Instead, Father gives his cell phone to the [C]hildren so they can play games on his cell phone instead of spending quality time with [the C]hildren. Father brings inappropriate foods for the [C]hildren. Father must be prompted to participate in daily care activities for [the C]hildren, such as changing diapers and setting boundaries. Father always had supervised visits. Father struggles to take initiative in interacting and maintaining the attention of [the C]hildren. [L.F.] attends trauma focused therapy once per week since November 2012. [L.F.] becomes extremely upset when Father or Mother miss visits. [L.F.] has a lot of anxiety about parent's well-being. Father and Mother stopped attending couples counseling. DHS had serious concerns about Father's ability to provide appropriate care and supervision for [the C]hildren independently. Although in the early part of the case, Father was found substantially and fully compliant, at the last review hearing on June 19, 2013, prior to DHS filing the Goal Change/Termination petition, Father was found minimally compliant. . . .

Trial Ct. Op., 10/20/14, at 1-3.

On October 31, 2013, DHS filed petitions to involuntarily terminate Mother and Father's parental rights to the Children. A March 24, 2014 FSP indicated the Children were in kinship care. On July 18 and August 25, 2014, the trial court held hearings. The witnesses were Maria Spencer, a DHS caseworker, Damaris Oliveria, a court case manager, Jennifer Brerethon, a therapist for L.F., and Father. On August 25, 2014, the trial court entered the instant orders terminating Mother's and Father's parental

rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8) and (b). Father timely filed notices of appeal, along with Pa.R.A.P. 1925(a)(2)(i) statements of errors complained of on appeal.

Father's first four issues are whether the trial court erred in finding clear and convincing evidence for terminatiion under Subsections (a)(1), (2), (5), and (8). Because many of his arguments overlap, we summarize his arguments together. Father maintains "the children were removed from the care of [M]other due to her drug problems," and that he "has never evidenced a settled purpose of relinquishing his rights to his children." Father's Brief at 15, 16. Father asserts he "has remedied his problems," "has cooperated with DHS," "substantially completed his FSP goals," completed parenting training and couples counselling, "visited regularly with both . . . children while continuing to be employed." *Id.* at 15, 17. He adds his home "was not evaluated for the children to live there," and "[t]he only testimony [about] the adequacy of his housing was the lack of beds for the" Children. *Id.* at 16. Father also asserts he "was a young [f]ather who did not speak English and looked to DHS . . . for guidance in reunification," but DHS failed to provide him "with reasonable efforts for reunification." *Id.* at 17. We find no relief is due.

We note the relevant standard of review:

> When reviewing an appeal from a decree terminating parental rights, we are limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of

discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, this Court must accord the hearing judge's decision the same deference that we would give to a jury verdict. We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

In addition, the trial court, as fact finder, is the sole determiner of the credibility of witnesses and resolves all conflicts in testimony.

*In re S.H.*, 879 A.2d 802, 805 (Pa. Super. 2005) (citations omitted).

The party seeking termination bears the burden "to establish by clear and convincing evidence the existence of grounds for doing so." *Id.* at 806.

The standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." It is well established that a court must examine the individual circumstances of each and every case and consider all explanations offered by the parent to determine if the evidence in light of the totality of the circumstances clearly warrants termination.

*In re J.L.C. & J.R.C.*, 837 A.2d 1247, 1251 (Pa. Super. 2003). "Our appellate review, however, does not require us to find clear and convincing evidence. We will affirm if the trial court's findings are supported by competent evidence, even if the record could also support an opposite result." *In re S.H.*, 879 A.2d at 806. "In addition, we need only find competent evidence to support the trial court's decision as to any one subsection of 23 Pa.C.S. § 2511(a) to affirm the termination." *Id.*

- 6 -

Section 2511(a)(1) and (b) provide:

§ 2511. Grounds for involuntary termination

**(a) General rule.—**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

\*　　\*　　\*

**(b) Other considerations**.—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (b).

This Court has stated:

To satisfy the requirements of section 2511(a)(1), the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties. In addition,

Section 2511 does not require that the parent demonstrate both a settled purpose of relinquishing parental claim to a child and refusal or failure to perform parental duties. Accordingly, parental rights

> may be terminated pursuant to [s]ection 2511(a)(1) if the parent either demonstrates a settled purpose of relinquishing parental claim to a child or fails to perform parental duties.
>
> Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to [s]ection 2511(b).

*In re Z.S.W.*, 946 A.2d 726, 730 (Pa. Super. 2008) (citations omitted).

Regarding the definition of "parental duties," this Court has stated:

> There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this Court has held that the parental obligation is a positive duty which requires affirmative performance.
>
> This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.
>
> Because a child needs more than a benefactor, parental duty requires that a parent exert himself to take and maintain a place of importance in the child's life.
>
> Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must

> exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs. . . .

*In re B., N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004) (citations omitted).

After careful review of the parties' briefs, the trial court opinion, and the record, including the notes of testimony, and the applicable law, we conclude that the thorough opinion filed by the Honorable Joseph Fernandes on October 20, 2014, addresses Father's issues and supports the reasons for termination under Subsection 2511(a)(1). On appeal, Father ignores the findings of the trial court and instead recasts the evidence in a light favorable to him. We cannot, however, reweigh the evidence. *See In re S.H.*, 879 A.2d at 805, 806. Accordingly, we adopt its analysis and affirm its findings under that subsection. *See* Trial Ct. Op. at 5 (finding Father: was "minimally compliant with his FSP objectives" "even though [he] was aware of" them; only attended visitation once per week although he was offered two visits per week, and thus missed 50% of his visits; failed to attend any of Children's medical visits, although he was invited; "never demonstrated his ability to keep the children safe from Mother;" "had to be redirected to participate in the daily care activities for his children;" "stopped going to couples counselling;" and further finding DHS provided reasonable and adequate services, including documents and interpreting services in his native Spanish). Because we affirm termination under Subsection

2511(a)1), we need not consider the grounds for termination under Subsections (a)(2), (5), and (8). *See In re S.H.*, 879 A.2d at 806.

Father's second claim on appeal is that termination does not serve the Children's physical and emotional needs under Subsection 2511(b). He maintains L.F. lived with him "for the first four years of his life and has a strong bond with" him, and that although [J.F.] only lived with Father for part of the first year of his life, Father "kept [their] strong bond through his continued visitation." Father's Brief at 18, 19. Father asserts he "should have been provided with realistic goals that would have permitted him unsupervised visitation." *Id.* at 18. Finally, he maintains "[t]he social worker testified that there was a bond between Father and L.F." *Id.* at 19. We find no relief is due.

With respect to Subsection 2511(b),

> Once the statutory requirement for involuntary termination of parental rights has been established under subsection (a), the court must consider whether the child's needs and welfare will be met by termination pursuant to subsection (b). In this context, the court must take into account whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship.
>
> When conducting a bonding analysis, the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well.

*In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010) (citations omitted).

This Court has held "the existence of some bond with [a parent] does not necessarily defeat termination of her parental rights. The question

- 10 -

becomes whether the bond between [the child and parent] is the one worth saving or whether it could be sacrificed without irreparable harm to" the child. *In re K.Z.S.*, 946 A.2d 753, 764 (Pa. Super. 2008). "In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *Id.* at 762-63.

We summarize that when the Children were adjudicated dependent and placed in foster care in August 2011, L.F. was four and a half years old and J.F. was two months old. When DHS filed the instant petitions to terminate, L.F. was almost seven years old and J.F. was two years and five months old. They remain in the same foster home.

At the first termination hearing, when asked whether there was a bond between Father and the Children, the prior DHS caseworker, Marcia Spencer,[2] testified that L.F. "knows" Father, as he was four years old when he was removed from the home. N.T., 7/18/14, at 38-39. However, Ms. Spencer responded "No," to the questions of whether she believed there was "a positive paternal bond" and "there would be irreparable harm to the children if [Father's] rights were terminated." *Id.* at 39. Finally, Ms.

_____

[2] Ms. Damaris, the current DHS caseworker, assumed supervision of the case in June 2014, after DHS had filed the petition to terminate and approximately five weeks prior to the July 18, 2014 termination hearing. *See* N.T., 7/18/14, at 56. Ms. Damaris' first name was not revealed in the hearing transcript.

Spencer opined it was in the Children's best interests for Father's parental rights to be terminated. *Id.* On cross-examination, Father's counsel asked Ms. Spencer about her knowledge of the bond between Father and the Children. *Id.* at 49. Ms. Spencer testified she had observed three or four visits and received reports from DHS and stated, "My observation is that very close interactive [sic] with [L.F. J.F.] was an infant, less interaction with [J.F.] [sic] because he was a baby. He would play with them and all. But to parent on a day to day basis long term, I don't think it was there." *Id.* at 49-50. On redirect examination, the following exchange occurred:

> [DHS' counsel:] . . . And even if the interaction between father and the child was close, do you think that that would cause irreparable harm to [L.F.] to have that bond severed?
>
> [Ms. Spencer:] No.

*Id.* at 55.

Damaris Oliveira, the current DHS caseworker, monitored visits between the Children and both parents.[3] *Id.* at 62. When asked if she thought there would "be any irreparable harm if the parental rights were terminated," Ms. Oliveira replied, "No, I think it would be more better [sic] mentally," and that termination would provide stability. *Id.* at 67. Ms.

---

[3] At the July 18, 2014 hearing, DHS' attorney called her next witness as "the current [case]worker, Miss Damaris." N.T., 7/18/14, at 56. However, the next line in the transcript is "(Witness not identified)," and the direct examination begins without the witness' stating her name or occupation on the record. *Id.* at 56. We presume the witness was Damaris Oliveira, who also testified at the August 25, 2014 hearing.

Oliveira also stated the Children had "very strong" bonds with their foster parents and call their foster mother "mom." *Id.* at 66.

Jennifer Brereton, L.F.'s therapist, testified to the following. L.F. calls Father "Dad" and knows he is his biological father. *Id.* at 76. The following exchange occurred:

> [Father's counsel:] Did [L.F.] ever express any feelings for his dad?
>
> [Ms. Brereton:] He's expressed anger about missed visits.
>
> Q. Has he ever expressed any kind of love for his father?
>
> A. Not, not that I recall.
>
> Q. . . . [D]id [L.F.] ever appear upset if his father didn't come?
>
> A. He's been upset when both [parents] have no[t] showed to the visits and there were no visits he's become upset.
>
> Q. Okay. You've never observed his interaction with his father?
>
> A. I have not.

*Id.* at 76-77. When asked by DHS' counsel whether she believed there would be irreparable harm if the parental rights were terminated, Ms. Brereton replied,

> I'm not minimizing that it would be a significant stressor but I believe in the current home and being in therapy [L.F.] has enough support to (inaudible). I think with what's more damaging [sic] to [L.F.] right now is his inconsistency—just about every session, honestly, [L.F.]

- 13 -

says, what's taking the judge so long, when I get an answer [sic].

*Id.* at 77-78. Ms. Brereton further testified L.F. "definitely wants to be adopted" and it was in his best interest to be adopted. *Id.* at 78.

The trial court, citing the above testimony of DHS caseworker Spencer, found Father and the Children do not have a parent/child bond. Trial Ct. Op. at 8 (citing N.T., 7/18/14, at 39, 49). The court recounted L.F.'s therapist Ms. Brereton's testimony that L.F. "never expressed any kind of love for his Father." Trial Ct. Op. at 8 (citing N.T., 7/18/14, at 76-77). With respect to the younger child, J.F., we note that a careful review of the record has revealed no specific testimony as to whether there was a bond between him and Father. Nevertheless, the trial court noted, "Children barely know their Father," "Father missed 50% of his visits and never attended any of the medical visits," and "[n]ot visiting with their Father would bring emotional stability to their lives." Trial Ct. Op. at 8-9. However, as noted above, J.F. was removed from Mother's care when he was two months old, and by the time DHS filed the termination petition, had spent two years and four months in foster care. Furthermore, both caseworkers, Ms. Spencer and Ms. Oliveira, opined termination would not cause irreparable harm to the Children and was in the Children's best interests. After careful review of the record, we agree with the trial court that DHS established grounds for termination under Subsection 2511(b). *See* 23 Pa.C.S. § 2511(b); *In re K.Z.S.*, 946 A.2d at 764 (stating in cases where there is no evidence of any

- 14 -

bond between parent and child, it is reasonable to infer no bond exists).

For the foregoing reasons, we affirm the orders of the trial court granting DHS' petitions to terminate Father's parental rights.

Orders affirmed.

Judgment Entered.

_____

Joseph D. Seletyn, Esq.

Prothonotary

Date: 5/11/2015

**IN THE COURT OF COMMON PLEAS** RECEIVED
**FOR THE COUNTY OF PHILADELPHIA**
**FAMILY COURT DIVISION** 2014 OCT 20 PH 12:48

In Re: In the Interest of J.R. and L.F.    : CP-51-DP-0001582-2011
    : CP-51-DP-0001583-2011
    : CP-51-AP-0000628-2013
    : CP-51-AP-0000629-2013
APPEAL OF: J.R., Father    : 2757 EDA 2014
    : 2709 EDA 2014

**OPINION**

**Fernandes, J.:**

Appellant, J.R. ("Father"), appeals from the Orders entered on August 25, 2014, granting the petition filed by the Department of Human Services of Philadelphia County ("DHS") to involuntarily terminate his parental rights to L.F. ("Child #1") and J.R. ("Child #2") pursuant to the Adoption Act, 23 Pa.C.S.A. §2511 (a)(1), (2), (5), (8), and (b). Lisa M. Visco, Esquire, counsel for Father, filed a timely Notice of Appeal with a Statement of Errors Complained Of pursuant to Rule 1925(b).

**Factual and Procedural Background**

DHS initially became involved with this family on January 29, 2007, when a General Protective Services report ("GPS") alleging that R.F. ("Mother") tested positive for phencyclidine ("PCP") at the time of Child #1's birth (N.T. 7/18/14, pg. 15). Child #1 remained hospitalized due to his exposure to drugs in utero. Mother admitted that she used cigarettes, alcohol, and cocaine on an almost daily basis during her pregnancy with Child #1. The family subsequently stabilized and DHS closed its case.

The family became involved with DHS again on June 6, 2011, when DHS received a GPS report which alleged that Mother tested positive for PCP at the birth of Child #2 (N.T. 7/18/14, pg. 16). Child #2's subsequent toxicology screen at the hospital was positive for PCP. Child #2 weighed four pounds and eight ounces at the time of his birth.

On July 18, 2011, DHS developed the Initial Family Service Plan ("FSP") and held a meeting (N.T. 7/18/14, pgs. 17-18). Father did not attend or otherwise participate in that meeting. At this time, there were no objectives for Father (N.T. 7/18/14, pg. 18).

On August 9, 2011, DHS received a GPS report alleging that Mother was observed attempting to push Child #2 into traffic (N.T. 7/18/14, pgs. 18, 25). Child #2 was in a stroller, but not strapped in, and only wearing a one-piece infant undergarment. Mother was under the influence of PCP at the time of the incident (N.T. 7/18/14, pgs. 18, 25). Following this incident, DHS obtained an Order of Protective Custody ("OPC") for both children and placed them in foster care (N.T. 7/18/14, pg. 19). At the time of children's placement, Father was minimally involved in their care. However, Father was made aware of Mother's PCP abuse (N.T. 7/18/14, pgs. 24-26, 30-31). Father stated that he was unable to care for the children because of his work schedule. On August 24, 2011, an adjudicatory hearing was held for both children. The court adjudicated the children dependent and committed them to DHS based on the present inability of parents (N.T. 7/18/14, pgs. 20-21). On September 20, 2011, DHS revised the FSP. Children's goal was to return to parent/guardian/custodian. Father's objectives were to visit children at the office of the placement agency on a weekly basis, keep and maintain regular contact with children, meet regularly with the agency social worker, participate in the Healthy Relationships Couples program with Mother, and comply with the Individual Service Plan ("ISP"). Father attended the meeting and signed the revised FSP. On November 29, 2011, DHS referred Father to the Achieving Reunification Center ("ARC") (N.T. 7/18/14, pg. 28). However, ARC deemed the referral inappropriate because Father did not speak English, and as a result could not participate in the services provided by ARC. Further research by ARC revealed that all service goals for Father could be achieved at Casa de Consejeria Y Salud Integral, Inc. ("CCSI") in Spanish. ARC referred Father to CCSI on November 29, 2011.

On December 1, 2011, the FSP was again revised. The goal for children was to return to parent/guardian/custodian and Father's objectives were to visit children at the office of the placement agency on a weekly basis, keep and maintain regular contact with children, to meet regularly with the agency social worker, to comply with the ISP, and attend services at CCSI. Father attended the meeting and signed the FSP. The FSP was revised again on May 15, 2012 and

on November 27, 2012. All of Father's objectives remained the same. Father attended and signed the revised FSP (N.T. 7/18/14, pgs. 27-30). During the time the children have been in care, Mother has resided on and off with Father.

In the ISP quarterly reports for the children from El Concilio for the period of May 7, 2013 through August 7, 2013, it was noted that obstacles to reunification remained. It was also noted that there were concerns about Father's ability to care for the children independently, set boundaries for Mother and the children while Mother attempted to achieve and maintain sobriety, and ensure the children's safety with and around Mother (N.T. 7/18/14, pg. 60). Father has stated that he is unable to create boundaries for Mother throughout the life of this case. Father is unwilling to put the children's needs before Mother's (N.T. 7/18/14, pgs. 36, 39-40, 69-70). Father also attended parenting classes, but did not complete the program due to his work schedule. Father was given twice a week supervised visits. Father only was able to visit once a week. When Father attends his visits, Father is reluctant to work on activities, such as assisting Child #1 with homework. Instead, Father gives his cell phone to the children so they can play games on his cell phone instead of spending quality time with his children. Father brings inappropriate foods for the children. Father must be prompted to participate in daily care activities for his children, such as changing diapers and setting boundaries. Father always had supervised visits. Father struggles to take initiative in interacting and maintaining the attention of his children. Child #1 attends trauma focused therapy once per week since November 2012. Child #1 becomes extremely upset when Father or Mother miss visits. He has a lot of anxiety about parents' well-being. Father and Mother stopped attending couples counseling. DHS had serious concerns about Father's ability to provide appropriate care and supervision for his children independently. Although in the early part of the case, Father was found substantially and fully compliant, at the last review hearing on June 19, 2013, prior to DHS filing the Goal Change/Termination petition, Father was found minimally compliant. DHS filed their Goal Change/Termination petition on October 31, 2013. The trial court terminated Father's parental rights on August 25, 2014. The barrier for Father to reunify the children with him is his inability to keep the children safe and protect them from Mother, along with providing appropriate care.

It should be noted that from a procedural standpoint, the trial court announced its decision on August 25, 2014, but the testimony as to Father was heard on July 18, 2014. The trial court required DHS to make reasonable efforts to provide notice to Mother; therefore, as to Mother only, the termination hearing was continued to August 25, 2014. On August 25, 2014, the trial court found DHS made reasonable efforts to serve Mother, but Mother chose not to appear for the Goal Change/Termination hearing.

**Discussion:**

On appeal, Father raised the following issues:

1. Did the trial court commit an error of law and abuse of discretion by involuntarily terminating Father's parental rights under 23 Pa.C.S.A. §2511(a), where the evidence showed that Father substantially complied with the FSP goals established by DHS?

2. Did the trial court commit an error of law and abuse of discretion by involuntarily terminating Father's parental rights under 23 Pa.C.S.A. §2511(b), where DHS failed to prove by clear and convincing evidence that involuntary terminating Father's parental rights would best serve emotional needs and welfare of Children?

As to the first issue on appeal, the grounds for involuntary termination of parental rights are enumerated in the Adoption Act at 23 Pa.C.S.A. §2511(a). The Adoption Act provides the following grounds for involuntary termination:

**(a) General rule** - The rights of a parent, in regards to a child, may be terminated after a petition is filed on any of the following grounds:

(1) The parent, by conduct continuing for a period of at least six months immediately preceding the filing of the petition, has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

In proceedings to involuntary terminate parental rights; the burden of proof is on the party seeking termination to establish by clear and convincing evidence of the existence of grounds for termination. *In re Adoption of Atencio*, 539 Pa. 161, 650 A.2d 1064 (1994). To satisfy section (a)(1), the moving party must produce clear and convincing evidence of conduct sustained for at least six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties. The standard of clear and convincing evidence is defined as testimony that is so clear, direct weighty and

convincing as to enable the trier of fact to come to a clear conviction without hesitance of the truth of precise facts in issue. *In re D.J.S.*, 1999 Pa. Super. 214 (1999).

Father did not achieve all of his FSP objectives throughout the life of case, even though Father was aware of his FSP objectives (N.T. 7/18/14, pgs. 26-33). At the last permanency review hearing on June 19, 2013, before DHS filed their Goal Change/Termination petition, Father was found minimally compliant with his FSP objectives. Father was offered twice a week supervised visitation, but he only made it for one day a week (N.T. 7/18/14, pgs. 34, 63-64). Father missed 50 percent of his visits and never attended any of the medical visits, even though Father was invited (N.T. 7/18/14, pgs. 63-64, 68). Father's visits were never changed from supervised to unsupervised. Father never demonstrated his ability to keep the children safe from Mother (N.T. 7/18/14, pgs. 34-36). Father had to be redirected to participate in the daily care activities for his children, such as changing diapers and setting boundaries (N.T. 7/18/14, pgs. 43-44) and (DHS Exhibit 45). Father had to be redirected to bring appropriate foods to the visits (N.T. 7/18/14, pgs. 37, 62-63). Father and Mother stopped going to couples counseling (N.T. 7/18/14, pg. 43) and (DHS Exhibit 45). All the services were offered to help Father reunify with his children. The record establishes that DHS provided and offered reasonable and adequate services to remedy the conditions that brought the children into care and throughout the life of this case, Father was offered documents and interpreting services in his native language, which is Spanish.

On October 31, 2013, DHS filed the petition for termination. Since 2011, Father continuously fails to perform his parental duties toward the children. Father's pattern of non-compliance continued for at least six months prior to the filing of the termination petition, as established by the trial court permanency review order from June 19, 2013. As a result, all the elements of the Adoption Act, 23 Pa.C.S.A. §2511(a)(1) have been fully satisfied.

The Adoption Act at 23 Pa.C.S.A. §2511(a)(2) also includes, as a ground for involuntary termination of parental rights, the repeated and continued incapacity, abuse, neglect or refusal of the parent that causes the children to be without essential parental care, control or subsistence necessary for his physical or mental well-being, and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent. This ground is not limited to

affirmative misconduct. It may include acts of refusal to perform parental duties but more specifically on the needs of the children. *Adoption of C.A.W.,* 683 A.2d 911, 914 (Pa. Super. 1996). Courts have further held that the implications of the parent's limited success with services geared to remedy the barriers to effective parenting can also satisfy the requirements of §2511 (a)(2). *In the matter of B.L.W.,* 843 A.2d 380 (Pa. Super. 2004), the court's grave concerns about the Father's ability to provide the level of protection, security and stability that his children needed was sufficient to warrant termination. Id. at 388.

Parent's lack of care and supervision of their children led to the children's dependency adjudication and to their placement in foster care on August 24, 2011. Father had consistently failed and refused to remedy the causes that brought children into care. Father is unable and unwilling to provide the level of protection, security and stability that the children need. Because of Father and Mother's relationship being on and off, and Father's knowledge that Mother has tested positive for PCP at least 16 times throughout the life of this case, Father is unable to protect children from Mother and keep them safe (N.T. 7/18/14, pgs. 30, 36, 39-40, 59-60). Father continues to live with Mother at the same address (N.T. 7/18/14, pg. 62). Father continuously puts the needs of the Mother before the needs of the children (N.T. 7/18/14, pgs. 36, 69-70). Based on the testimony on the record, the trial court had grave concerns about Father's ability to provide the level of protection, security, and stability that the children need. For Father, the needs of the children were secondary to Mother's needs. The children have been in placement for a period of thirty-six months (N.T. 8/25/14, pg. 23). The children need permanency. Father is unable to remediate the causes that brought children into care. DHS has met its burden under 23 Pa.C.S.A. §2511(a)(2).

DHS also requested termination of parental rights under 23 Pa.C.S.A. §2511(a)(5), whereby children may be removed by court or voluntary agreement and placed with an agency at least six months, conditions which led to the placement of the children continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services reasonably available to the parent are not likely to remedy the conditions leading to placement, and termination best serves the children's needs and welfare.

DHS, as a child and youth agency, cannot be required to extend services beyond the period of time deemed as reasonable by the legislature or be subjected to herculean efforts. A child's life cannot

be put on hold in hope that the parent will summon the ability to handle the responsibilities of parenting. *In re J.T.*, 817 A.2d 509 (Pa. Super. 2001). As a consequence, Pennsylvania's Superior Court has recognized that the children's needs and welfare requires agencies to work toward termination of parental rights when a children has been placed in foster care beyond reasonable temporal limits and after reasonable efforts for reunification have been made by the agency, that have resulted unfruitful. This process should be completed within eighteen months. *In re N.W.*, 851 A.2d 508 (Pa. Super. 2004).

The children have been in care for a period of thirty-six months (N.T. 8/25/14, pg. 23). Father continues to be unable to summon the ability to handle his responsibilities of parenting. Hence, Father's lack of parental skills and minimal compliance with his FSP objectives compel this court to conclude that children are no closer to be reunified with Father. The children's life cannot be put on hold any longer in hope that the Father will remedy the conditions that led to placement within a reasonable amount of time. Father was aware of his FSP objectives, but was unable to complete them within thirty-six months. Through the life of this case Father was never able to obtain unsupervised visitation with his children because based on his supervised visits, Father was unable to demonstrate that he had the capacity to parent (N.T. 7/18/14, pgs. 36, 43-44). For instance, Father did not know how to change a diaper and Father had to be prompted to change Child #2's diaper (N.T. 7/18/14, pg. 44). Father brought junk food to the visits, even after he was told not to (N.T. 7/18/14, pgs. 62-63). The lack of permanency for children takes an emotional toll on Child #1. The main reason why Child #1 is in therapy is lack of permanency (N.T. 8/25/14, pgs. 20-21). When there are periods of time when Child #1 does not have visits from his parents, he seems to be functioning really well and therapy progresses (N.T. 8/25/14, pg. 21). However, when the visits do happen or are inconsistent Child #1 becomes confused and no progress happens in therapy (N.T. 8/25/14, pg. 21). Child #1 has even expressed anger towards Father when Father missed visits (N.T. 7/18/14, pg. 76). Child #2 is not receiving therapy because he is only three years old (N.T. 8/25/14, pg. 20). The children have been in care for thirty-six months. The needs and welfare of the Children dictate that termination and adoption would best serve their permanency needs. DHS met its burden under the Adoption Act, 23 Pa.C.S.A. §2511(a)(5).

As to §2511(a)(8) of 23 Pa.C.S.A., DHS met its burden by clear and convincing evidence that the children have been out of Father's care for twelve months or more, and the conditions leading to the

placement still exist, and termination would best serve the needs and welfare of the children. The children have been continuously under DHS' custody for a period of thirty-six months (N.T. 8/25/14, pg. 23). The conditions that led to the children's placement still exist. Despite the good faith efforts of DHS to make services available, it is in the best interest of the children to terminate Father's parental rights (N.T. 7/18/14, pgs. 39, 67, 78), (N.T. 8/25/14, pgs. 15-16, 18).

The trial court will now consider Father's last issue on appeal, whether the termination of parental rights would best serve the emotional needs and welfare of the children under 23 Pa.C.S.A. §2511(b). The party seeking termination must prove by clear and convincing evidence that the termination is in the best interest of the child. The best interest of the child is determined after consideration of the needs and welfare of the child, such as love comfort, security and stability. *In re Bowman,* 436 Pa. Super. 647, A.2d 217 (1994). See also *In re Adoption of T.B.B.,* 835 A.2d 387, 397 (Pa. Super. 2003). Pursuant to 23 Pa.C.S.A. §2511(b), the trial court must also consider what, if any bond exists between Father and children. *In re Involuntary Termination of C.W.S.M. and K.A.L.M.,* 839 A.2d 410, 415 (Pa. Super. 2003). The trial court must examine the status of the bond to determine whether its termination "would destroy an existing, necessary and beneficial relationship." *In re Adoption of T.B.B.,* 835 A.2d 387 (Pa. Super. 2003). In assessing the parental bond, the trial court is permitted to rely upon the observations and evaluations of social workers. *In re K.Z.S.,* 946 A.2d 753,762-763 (Pa. Super. 2008). Under 23 Pa.C.S.A. §2511(b), the rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical, if found to be beyond the control of the parent.

The children will not suffer any irreparable harm by terminating Father's parental rights (N.T. 7/18/14, pgs. 55, 67, 77), (N.T. 8/25/14, pgs. 15, 17, 23). Foster parents and children have a strong parent/child bond (N.T. 7/18/14, pg. 66), (N.T. 8/25/14, pg. 23). Father and children do not have a parent/child bond (N.T. 7/18/14, pgs. 39, 49), (N.T. 8/25/14, pg. 23). Child #1 has never expressed any kind of love for his Father (N.T. 7/18/14, pgs. 76-77). The children continue to flourish in the foster home and the children have bonded with the foster family (DHS Exhibit 45). Terminating Father's parental rights would not destroy an existing necessary relationship between Father and Child #1 and Child #2. Children barely know their Father. Not visiting with their Father would bring emotional stability to their lives (N.T. 7/18/14, pgs. 67, 74-75). Father missed 50 percent of

his visits and never attended any of the medical visits, even though Father was invited (N.T. 7/18/14, pgs. 63-64, 68).

It is in the best interest of children to be adopted (N.T. 7/18/14, pgs. 39, 67, 78), (N.T. 8/25/14, pgs. 16, 18). DHS has provided reasonable services to Father. The trial court has found reasonable efforts at every permanency review hearing. The court determined that the testimonies of the DHS witnesses were credible. Additionally, the record clearly establishes that Father's parental rights are being terminated due to his lack of non-compliance with his FSP objectives, no parent/child bond, and no irreparable harm would occur by terminating Father's parental rights. Terminating Father's parental rights is not due to environmental factors. The children have been in placement for thirty-six months and the children need permanency. Consequently, the trial court did not err in terminating Father's parental rights and changing the goal to adoption, it would best serve the emotional needs and welfare of the children.

**Conclusion:**

For the aforementioned reasons, the court finds that DHS met its statutory burden by clear and convincing evidence regarding the termination of the parental rights pursuant to 23 Pa.C.S.A. §2511(a) and (b). The court also finds that it will not cause irreparable harm to the children to sever any bond, and it is in the best interest of the children since it would best serve the emotional needs and welfare of the children.

Accordingly, the order entered on August 25, 2014, terminating the parental rights of Father, J.R., should be affirmed.

By the court

Joseph Fernandes, J.

## CERTIFICATE OF SERVICE

I hereby certify that this court is serving a copy of this duly executed Order upon all parties or their counsel on <u>October 20, 2014</u>, by regular mail and/or fax. The names and addresses of all persons served are as follows:

Assistant City Solicitor Katherine Holland, Esq.
City of Philadelphia Law Department
1515 Arch Street, 16th Floor
One Parkway Building
Philadelphia, Pennsylvania 19102-1595
Department of Human Services

Lisa M. Visco, Esq.
1800 JFK Blvd. – Suite 300
Philadelphia, Pennsylvania 19103
Attorney for Father

Mary Cole, Esq.
1441 Sansom Street, 9th Floor
Philadelphia, PA 19103
Child Advocate

James Martin, Esq.
1800 JFK Blvd. – Suite 300
1424 Chestnut Street
Philadelphia, Pennsylvania 19103
Attorney for Mother

BY: _____
Ana R. Melhor
Judicial Fellow
Hon. Joseph L. Fernandes
Judge Court of Common Pleas
First Judicial District of Pennsylvania
Family Division
Vine Street, Room 345
Philadelphia, Pa. 19103
Telephone: (215)-686-2660